34 C.C.P.A.(Patents)

### In re SWEENEY et al.
### Patent Appeal No. 5238.

Court of Customs and Patent Appeals.
Feb. 11, 1947.

George J. Silhavy, of New York City (W. F. Weigester, of Washington, D. C., of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the examiner's rejection of all the claims (numbered 1, 6, and 10 to 16, inclusive,) of appellants' application for patent, entitled "Chemical Reactions."

The claims relate to a method of carrying out catalytic reactions in oil cracking processes.

Claims 1 and 14 read:

"1. A method of carrying out catalytic reactions which comprises mixing heated gaseous fluid with divided catalyst particles, passing the resulting mixture generally upwardly through a reaction vessel having a large cross-sectional area, selecting the velocity of the gaseous fluid whereby a relatively high density fluidized liquid-simulating mixture of catalyst and gaseous fluid is obtained, said vessel being provided with spaced horizontally arranged baffles having openings therethrough to permit passage of the mixture, the mixture in passing through said reaction vessel forming turbulent zones between said baffles and said baffles preventing recirculation of catalyst particles from the top of said reaction vessel to the bottom of said reaction vessel."

"14. A method of carrying out reactions which compromises contacting solid subdivided particles with a gaseous medium passing upwardly through a reaction vessel having a large cross-sectional area, selecting the velocity of the upflowing gaseous medium in said vessel to form a dense fluidized, liquid-simulating mixture of solid

particles and gaseous medium, passing the mixture generally upwardly through said reaction vessel provided with spaced horizontally extending perforated baffles having openings to provide confined zones of turbulence and permit general upward movement of the solid particles and gaseous medium while eliminating recirculation of the solid particles from the top of said reaction vessel to the bottom thereof."

In his analysis of the claims, the examiner said:

"Claim 1 calls for a method of carrying out catalytic reactions which comprises mixing heated gaseous fluid with divided catalytic particles, passing the resulting mixture generally upwardly through a reaction vessel having a large cross-sectional area, selecting the velocity of the gaseous fluid whereby a relatively high density fluidized liquid-simulating mixture of catalyst and gaseous fluid is obtained. The claim specifies that the reaction vessel is provided with spaced horizontally arranged baffles having openings therethrough for passage of the mixture. The claim recites that the mixture of catalyst and gaseous fluid forms turbulent zones between the baffles during its passage through the reaction vessel. It is further specified in the claim that the baffles prevent recirculation of catalyst particles from the top to the bottom of the reaction vessel.

\* \* \* \* \* \*

"Claim 6 differs from claim 1 by being restricted to catalytic conversion of hydrocarbons from higher to lower molecular weight hydrocarbons. The claim also adds that the products of the conversion in vapor form and solid catalyst particles are conducted away from the reaction vessel and the catalyst particles are separated from the vapors.

\* \* \* \* \* \*

"Claim 10 differs from claim 6 in statements of function such as the statement 'that the horizontal extending baffles prevent undesirable recirculation of the catalyst particles from the top to the bottom of the cracking zone'.

\* \* \* \* \* \*

"Claim 11 adds to claim 10 that the catalyst particles from the cracking step which are fouled and contain burnable deposits are mixed with oxygen and passed through a regeneration zone where in the burnable deposits are burned off from the catalyst and the thus regenerated catalyst is returned to the cracking zone. Claim 11 also recites that the regeneration zone contains spaced horizontally extended partitions such as have been described in connection with the reaction zone. These horizontal partitions perform the same function in the regeneration zone as in the reaction zone.

\* \* \* \* \* \*

"Claim 12 adds to claim 10 that the solid particles comprise powdered clay and that the dense mixture in the cracking zone has a density of about 15 to 25 pounds per cubic foot.

\* \* \* \* \* \*

"Claim 13 is drawn to the step of regenerating solid sub-divided contact particles and is similar in that respect to claim 11.

\* \* \* \* \* \*

"Claim 14 is broader than any claim previously discussed in that it is not limited to any particular reaction and in that the solid particles are not said to be catalytic in nature.

\* \* \* \* \* \*

"Claim 15 adds to claim 14 that the catalyst particles are fouled with burnable deposits and that the gaseous medium contains oxygen.

\* \* \* \* \* \*

"Claim 16 is somewhat similar to claim 10 but adds thereto the step of withdrawing vapors and catalyst particles from the reaction zone and purging the withdrawn catalyst particles with a stripping gas to remove volatile hydrocarbons therefrom."

The prior art cited consists of two patents, viz.: Osterstrom et al., 1,873,783, Aug. 23, 1932; Goddin, 2,302,209, Nov. 17, 1942.

While all the claims are method claims, the drawings disclose an apparatus by means of which the method may be practiced and this was used by the examiner and is also used in the brief for appellants before us in giving a step by step description of the process. There is no material difference between the two descriptions, and the following is in the nature of a paraphrase of the two:

Hydrocarbon vapors and gases are introduced into a "dispersion" chamber through a pipe line. Through another pipe line a catalyst (such as a suitable clay) which has been reduced to "powdered form" is introduced into the "dispersion" chamber. In the "dispersion" chamber the hydrocarbon vapors and gases become mixed with the powdered catalyst. From the "dispersion" chamber the mixture passes through pipes into a "reaction" chamber which contains equally-spaced, perforated baffles, arranged horizontally, and then passes to the upper end of the "reaction" chamber. From the "reaction" chamber the mixture passes through a pipe into a "cyclone separator" in which there is equipment to effect separation of the vaporous products from the catalyst particles. The catalyst particles are withdrawn through a pipe into a "regenerator" chamber where, by means of air admitted through a pipe, the carbon which has accumulated on the particles in the previous steps of the process is burned off, some traces of oxygen, however, being left. The "regenerator" chamber, like the "reaction" chamber is supplied with equally-spaced, perforated baffles, horizontally arranged. The gases together with the "regenerated" (that is cleaned of carbon) catalyst particles pass out through a pipe extending from the top of the regenerator chamber to another "cyclone separator." From that separator the gases pass, through a pipe, to a receptacle from which they are withdrawn for use as desired, the catalyst particles remaining in the separator. Steam is admitted into the separator in order to "purge" the catalyst particles of the traces of oxygen remaining after the step of burning off the carbon. The "regenerated" particles are then withdrawn from the "cyclone separator" and returned to the beginning point for re-use in another cracking operation.

It appears that when the mixture is passed through the "reaction" chamber the catalyst particles are suspended in the upflowing gaseous fluid and the velocity of the upflowing vapors maintains the particles in a "fluidized" condition so that the mixture is turbulent and mobile and "assumes the appearance of a liquid and can be handled like a liquid."

In the brief for appellants (referring to the perforated baffles in the reaction vessel) it is said (omitting the numerals as indicated by stars): "These perforated baffles while permitting upward movement of the vapors and particles prevent recirculation of the catalyst particles from the top portion of the reaction of vessel * * * to the bottom thereof and also reduce the extreme turbulence and mixing which has certain disadvantages as above pointed out. Turbulence and eddy currents and good mixing exist in spaced zones in the reaction vessel * * *. These zones are restricted to the spaces between the baffles. The solid particles are maintained as layers of fluidized, liquid-like mixtures on each of the baffles or partitions * * *. The vapors and solid particles pass upwardly through the reaction vessel * * *. The perforated baffles act as separating means between the zones and it is to be noted that each baffle has a plurality of openings and the baffles are not relied upon as mixing means."

The basic reference is the patent to Goddin which, as recited, in substance, in the brief of the Solicitor for the Patent Office, discloses a catalytic hydrocarbon conversion system in which oil vapors passed from a furnace are mixed with a powdered catalyst supplied through a valve. The mixture passes through a pipe into the bottom of a reactor vessel. The catalyst material may be a clay such as bentonite and the density of the oil and catalyst mixture in the reactor may be about 13 pounds per cubic foot. The mixture passes upwardly through the reactor to a separator and, after separation, the catalyst is mixed with air and passed through a regenerator which is quite similar in construction to the regenerator of appellants. The coating of carbon which forms on the catalyst in the reactor is burned off in the regenerator and the catalyst is then ready for re-use.

From the foregoing, it is apparent that the *method* steps outlined by appellants are quite similar to those outlined in the Goddin patent. The Goddin patent, however, does not disclose the *structural* feature of baffles, nor any equivalent thereof. The "baffles" feature, stated in terms of structure, together with the function of the baffles—that

is their effect on circulation—is embraced in claims 1 and 11, and at least implied in other of the claims.

In our decision in the case of In re Freeman et al., 108 F.2d 244, 245, 27 C.C. P.A., Patents, 795, 797, we said, citing authorities, "It is well settled that the means employed cannot lend patentability to a claimed method." The board applied this well settled rule in the instant case, saying: "It is * * * noted that the claims here on appeal are method claims and that the difference in structure of the apparatus used to carry out the method cannot be considered as a patentable limitation in the process."

We think the rule is applicable and this might be regarded as dispositive of the case so far as the baffles feature is concerned, but in addition we take note of the fact that the other reference patent—that to Osterstrom et al.—discloses the availability of baffles for use in an oil treating process in which oil vapors from a furnace pass through a pipe where they become mixed with a catalyst consisting of powdered clay introduced from a hopper, the mixture so formed entering the bottom of a "contact" chamber and passing upwardly through it and thence into other chambers where finally the catalyst is regenerated—that is the particles are cleaned of carbon so that they are ready for catalytic re-use.

The specification in the Osterstrom et al. patent, after describing what we suppose may be regarded as a preferred method, states: "While there has been specifically described a particular type of contact vessel which may be used in carrying out the invention, nevertheless it may be understood that other types of vessels may also be utilized. For example, as shown in Figure 4, pipe sections 10a may be employed, flanged on both ends with orifice plate 10b inserted between each pipe section. Again, the mixing may be secured by means of an ordinary cylinder with sufficient obstructions *in the form of baffle plates or similar devices* placed in the cylinder so that a violent swirling action will take place, providing the contact which is desired." (Italics ours.)

The orifice plate so referred to is clearly shown in Fig. 4 of the Osterstrom et al. patent drawings and it is arranged horizontally.

The brief of the Solicitor for the Patent Office aptly states: "The function of baffles in retarding fluid flow and producing turbulence is universally understood and it is an obvious expedient to employ baffles wherever it is desired to obtain the conditions which they are known to produce. Further, Osterstrom discloses the use of baffles in a contact device exactly corresponding to the reactor of Goddin, and explains that such baffles will produce 'a violent swirling action.' The exact form of baffle used is immaterial especially in a process claim, but Osterstrom shows, in Fig. 4, a baffle consisting of a plate having one opening, and there would clearly be no invention in using more openings or more plates, especially in view of the patentee's broad reference to the use of 'baffle plates or similar devices.' Claim 1, therefore, calls for nothing more than a modification of Goddin's reactor which would be obvious in view of Osterstrom and which would produce no new or unexpected result."

We think it clear that claim 1 was properly rejected on the Goddin patent in view of the Osterstrom et al. patent, and we do not find any limitation in any other of the appealed claims which would render it patentable independently of claim 1. The examiner discussed in detail the limitations which we have quoted from his statement, supra, and rejected all other claims for the same reasons given for his rejection of claim 1, the opinion being also expressed that the broad claim 14 is substantially met by the Osterstrom et al. patent taken alone.

We do not understand that counsel for appellants insist that the other claims are allowable unless claim 1 be held allowable, but we have carefully considered the analysis made of them in appellants' brief. It is not deemed necessary to here analyze the claims further or discuss them in detail.

We are not convinced that the board erred in affirming the examiner's rejection of all the claims, and its decision is affirmed.

Affirmed.